IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

MELISSA HOPFINGER,

     Plaintiff,

v.                                                                           Case No. 3:18-CV-1523-NJR

BRIAN FLETCHER, ERIK ROLF,
CITY OF NASHVILLE, ILLINOIS,
JOSH FARK, SUE FINKE,
TERRY KOZUSZEK, DOUG HARGEN,
KELLY SHERIDAN, and
DENNIS KELLERMAN,

     Defendants.

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the Court are cross-motions for summary judgment filed by Defendant Brian Fletcher (Doc. 100), Defendants City of Nashville, Illinois, Erik Rolf, Josh Fark, Sue Finke, Terry Kozuszek, Doug Hargen, Kelly Sheridan, and Dennis Kellerman (Doc. 102), and Plaintiff Melissa Hopfinger (Doc. 104). Hopfinger also has filed a motion for adverse inference finding and charge against Defendant City of Nashville. (Doc. 106). For the reasons set forth below, judgment as a matter of law is granted to Defendant Fletcher; granted in part and denied in part as to the remaining Defendants; and denied as to Plaintiff Hopfinger. Hopfinger's motion for adverse inference finding is also denied.

### INTRODUCTION

This action stems from the termination of Plaintiff Melissa Hopfinger from her position as an administrative assistant with the City of Nashville Police Department ("Department"). (Doc. 1-1). Hopfinger alleges she was terminated in retaliation for exercising

her right to free speech and/or serving as a whistleblower on two occasions while she was employed by the Department and for taking leave under the Family Medical Leave Act ("FMLA"). Defendants deny Hopfinger's allegations and assert she was fired for misrepresenting her hours worked on her timesheets.

Hopfinger initiated this lawsuit on August 21, 2018, and she filed her First Amended Complaint on October 30, 2018. (Docs. 1, 17). At the time of the events at issue, Defendant Erik Rolf was the Mayor of the City of Nashville, Illinois ("the City"), Defendant Brian Fletcher was the Chief of Police, and Defendants Josh Fark, Sue Finke, Terry Kozuszek, Doug Hargen, Kelly Sheridan, and Dennis Kellerman were members of the City Council. (*Id.* at ¶¶ 5-7). After the Court's Order on Defendants' motions to dismiss (Doc. 59), Hopfinger is proceeding on the following claims:

**Count I:**      FMLA Interference against the City of Nashville;

**Count II:**     FMLA Retaliation against the City of Nashville;

**Count V:**      First Amendment Retaliation against the City of Nashville, Brian Fletcher, Erik Rolf, Josh Fark, Sue Finke, Terry Kozuszek, Doug Hargen, Kelly Sheridan, and Dennis Kellerman;

**Count VI:**     Illinois Whistleblower Act against the City of Nashville; and

**Count VII:**    Retaliatory Discharge against the City of Nashville.[1]

Because Hopfinger raises claims under the FMLA and the First Amendment, this Court properly has subject matter jurisdiction over Counts I, II, and III pursuant to 28 U.S.C. § 1331. The Court further has supplemental jurisdiction over Hopfinger's claims in Counts VI and VII under 28 U.S.C. § 1367.

---

[1] Hopfinger also sued the City for breach of contract, but she has now voluntarily dismissed that count. (Doc. 130 at p. 23).

## FACTS

Melissa Hopfinger began working for the City in 1999, serving most recently as the administrative assistant to Police Chief Brian Fletcher. (Doc. 103-1 at p. 170). As an administrative assistant, Hopfinger's duties included filling out timesheets for herself and the officers in the Department, including Fletcher, and turning them into City Hall. (Doc. 103-1 at pp. 45-47). She also obtained duty weapons qualifications documents from the Department's officers and recorded them for submission to the Illinois Law Enforcement Training and Standards Board. (Doc. 101-3, p. 46-47, 105). Hopfinger reported to Fletcher, and Fletcher reported to Mayor Rolf. (Doc. 101-5 at p. 2). Greg Hopfinger, Melissa's spouse, was Lieutenant for the Department. (Doc. 103-1).

### Hopfinger's Statements Regarding Chief Fletcher

In November 2016, Hopfinger told Fletcher that several documents related to officers' weapons qualifications were forged to make it look like the officers had qualified for their firearms within one year of the previous year's qualification date, even though they had not. (Doc. 101-3 at pp. 93-98). Specifically, the documents were dated October 10, 2016, but Hopfinger knew they did not qualify until November 1, 2016. (*Id.* at p. 98). Fletcher told her to submit the forms with the October date on them. (*Id.* at p. 99).

At a Nashville Police Committee Meeting held on February 13, 2017, an executive session was held where then-Mayor Ray Kolweier stated that Greg Hopfinger had reported Fletcher was not doing his work, was never around, and was non-responsive to people, causing paperwork to go unfinished and the City to lose money. (Doc. 131-16). Greg Hopfinger also reported that the firearms qualification sheets for two officers had been altered. (*Id.*). The consensus of the Committee was to "go and speak to the Chief." (*Id.*).

In early May 2017, Hopfinger spoke with Mayor Rolf regarding Fletcher's failure to provide sufficient information to account for his absences from work. (Doc. 101-3 at p. 133). Without the information on Fletcher's absences, Hopfinger was concerned the City was not accurately reducing his sick or vacation leave balances. (*Id.*). Hopfinger believed that Fletcher was stealing money from the City by using leave time without being charged for the leave. (*Id.*). She also told Rolf that Fletcher was not speaking to her. (*Id.*). Rolf told Hopfinger to "hang in there" and that "it would get better." (*Id.*). Rolf testified he took no action as a result of that conversation. (Doc. 101-5 at p. 8).

On May 30, 2017, Lee Ryker, an investigator with the Illinois Training Standards Board, came to the Department. Greg and Melissa Hopfinger were both present when Ryker arrived. Ryker told Greg Hopfinger he was there because Chief Fletcher and two other officers were behind on their firearms' qualifications. (Doc. 101-6 at p. 49). Melissa Hopfinger called Fletcher on his cell phone, but Fletcher told her he was eating and would not be coming up there. (*Id.*). Melissa Hopfinger then told Ryker the officers' firearms qualification sheets were forged and that the officers did not qualify within the one-year time frame. (Doc. 101-3 at p. 99). Hopfinger testified that she knew they were forged because the officers had turned in overtime sheets indicating they did their qualifications on November 1, 2016, but that the qualification sheets said October 10, 2016. (*Id.*). Hopfinger also told Ryker that Fletcher failed to accrue the minimum amount of training hours required for police chiefs by the Training Standards Board. (*Id.* at p. 100). Before Ryker left, he gave Hopfinger a letter addressed to Fletcher to put in Fletcher's mailbox. (Doc. 101-7; Doc. 101-3 at p. 147). The letter advised Fletcher that he and two others needed new firearms qualifications, but it did not mention anything about Ryker's conversation with Hopfinger. (*Id.*). Hopfinger did not tell Fletcher or

anyone on the City Council about her conversation with Ryker. (Doc. 101-3 at p. 134).

### The Department's Timekeeping System and Hopfinger's Leave

The Department had an unusual timekeeping system. While a pay period consisted of two weeks, timesheets had to be turned in by Monday of the second week, or noon on Tuesday at the latest. (Doc. 101-3 at pp. 37-38). The Department then presumed that the employee worked the last three days of the pay period—Wednesday, Thursday, and Friday. (*Id.*). The rationale for this policy was that law enforcement is on-call at all times; even a scheduled vacation might not happen if the employee is called into work. (*Id.* at p. 40). Rather than having to go back in and adjust one's pay, the Department just "caught it on the next pay period." (*Id.*).

The Department also had its own method of keeping track of "comp time." Comp time was time awarded by the Mayor or the Police Chief and was recorded in the Department's "Blue Book." (*Id.* at p. 48). In the City's policy manual, Hopfinger's position was not one that was eligible to receive comp time, yet Fletcher admitted awarding comp time to her. (*Id.* at pp. 67-68; Doc. 131-3 at p. 10). Furthermore, the City Clerk was to keep a record of all earned comp time, which employees would note on their timesheets. (*Id.* at p. 68). Either Fletcher or a predecessor Police Chief told Hopfinger not to have the City Clerk record her comp time because "it was none of her business." (*Id.*). Hopfinger never brought it to either Chief's attention that her position was not eligible for comp time. (*Id.*).

On Monday, July 17, 2017, Hopfinger was scheduled to have a hysterectomy. The City of Nashville requires an employee to complete two forms before taking FMLA leave: a request for leave form and a certification from a physician or a practitioner. (Doc. 103-1 at p. 11). Hopfinger testified that she submitted a request for leave form to Fletcher by putting

it in his personal mailbox in the office but that she never received his signature because he never returned it to her. (*Id.* at p. 12; Doc. 105-2 at p. 3). Hopfinger also attempted to contact Fletcher on Thursday, July 13, 2017, to get his approval. (*Id.*).

Fletcher testified that he was aware Hopfinger was going on leave because Greg Hopfinger told him she was having surgery. (Doc. 105-4 at p. 9). He also acknowledged that Hopfinger had mentioned her surgery to him and was upset that he hadn't asked her about her medical issues. (*Id.*). The City's attorney, Jim DeFranco, testified that Hopfinger's leave "was absolutely legitimate, there was no question at least in my mind, [the City] thought the leave was absolutely legitimate, it was requested properly, and they had no question granting it." (Doc. 146-1).

Hopfinger testified that, while she knew she would be out on Monday, July 17, she did not know if she would be out the rest of the week because, until they rolled her in and put her out, the surgery was "still [her] choice." (*Id.* at p. 44). Thus, when Hopfinger prepared the Department's timesheets to be submitted on Monday, July 17, she recorded 80 hours of regular time for the two-week pay period ending July 21. (*Id.* at pp. 44-45). She also deducted eight hours of her comp time in the Blue Book for July 17. (Doc. 131-1 at ¶ 20). She did not record any hours of comp time, vacation time, or personal time for Tuesday, July 18, through Friday, July 21. (Doc. 101-3 at pp. 44-45). Hopfinger brought the Blue Book home with her, as she expected to continue preparing the Department's timesheets while she was out on leave. (Doc. 131-1 at ¶ 16).

The next pay period ended August 4, 2017. Pursuant to the Department's unusual pay period policies, Greg Hopfinger turned in Melissa Hopfinger's timesheet on August 1, 2017. (*Id.* at ¶ 20). On that pay period's time sheet, Hopfinger put down 32 "regular hours" and

48 hours of "sick leave." (*Id.*). The 32 "regular hours" consisted of another day of comp time that she deducted from the Blue Book, which covered July 18, and three vacation days that Greg Hopfinger permitted her to carry over from the previous year so she would not lose them. (*Id.*). Those three vacation days were used to cover July 19, 20, and 21.[2] (*Id.*). Hopfinger used a Nashville Police Department comp time sheet to request the 16 hours of comp time for July 17 and 18, which Chief Fletcher had previously awarded her and which Greg Hopfinger approved. (*Id.* at pp. 58-65).

Hopfinger explained that she did not include any reference to comp time on her timesheet because of past practice and instruction by Fletcher and other Chiefs of Police. (Doc. 131-1 at ¶ 20). Furthermore, if she had reported the use of vacation time, the City Clerk would have deducted the vacation days from her current vacation balance, which would have been inaccurate. (*Id.*). When asked how anyone at the City of Nashville would know she was using comp time to cover some of her leave considering she kept all the records at her house, she stated, "Greg was my supervisor." (*Id.* at p. 48).

Hopfinger attested that she would have adjusted for the last four days of the second week of the pay period ending August 4, 2017—that is, August 2, 3, and 4—on the next timesheet two weeks later. (Doc. 131-1 at ¶ 20).

### Hopfinger's Termination

Terry Kurwicki was elected as City Clerk in July 2017. Based on Hopfinger's timesheets for the periods ending July 21 (submitted on July 17) and August 4 (submitted on August 1), Kurwicki contacted Mayor Rolf. Kurwicki was concerned that something did not

---

[2] Hopfinger testified that on July 14 she signed a paper seeking permission to use these three carry-over vacation days for July 19, 20, and 21 (Doc. 101-3 at p. 56). Greg Hopfinger approved the request on July 17, as he was taking care of payroll that day in Melissa's absence (*Id.* at p. 57).

look right. (Doc. 103-3 at pp. 2-3).

At the City Council meeting on August 3, 2017, Chief Fletcher and Mayor Rolf expressed their concern that Hopfinger had reported time on her timesheets that she did not work. (Doc. 103-5 at pp. 112-13). Fletcher also complained that both Hopfingers create a "hostile work environment," and that he could not deal with the drama anymore. (Audio Recording of August 3, 2017 City Council meeting). Fletcher explained that Hopfinger had asked him why he wasn't talking to her and why he didn't ask her about her upcoming surgery. (*Id.*). He said he didn't want to be involved in her personal issues. (*Id.*). He further stated to the City Council members: "I'm done. I can't deal with this drama with these two, they have caused so much disruption within this department. . . . I'm ready to be done with them. The past three weeks since she's been gone have been wonderful." (*Id.*) He then requested direction from the Council. (*Id.*) Mayor Rolf decided to gather more information before taking any action. (*Id.*).

At the City Council meeting on August 15, 2017, the topic of Hopfinger's time records was discussed again. (Doc. 103-2 at p. 6). The members discussed Hopfinger's leave and whether it was properly requested under FMLA but agreed that her job would not be protected if she were "cooking the books." (Audio CD Recording of August 15, 2017 City Council meeting). One council member suggested it may be best to provide no reason for her termination so as to avoid implicating the FMLA. (*Id.*). The decision was made to determine whether Hopfinger had requested FMLA and to research whether they could terminate her for her fraudulent timesheets while she was on FMLA. (*Id.*). Rolf later testified, however, that he and the Council gave their "advice and consent" for Fletcher to fire Hopfinger at that

August 15 City Council Meeting.[3] (Doc. 103-2 at p. 6).

According to Rolf, Fletcher asked him to come to the Department on August 30, 2017, to meet with Hopfinger. (Doc. 103-2 at p. 4). Fletcher had received a notice that Hopfinger would be coming back to work on August 30, and Fletcher wanted a witness to the termination. (*Id.*). Fletcher also had a written termination letter ready for Hopfinger. (*Id.* at p. 5). Rolf testified that he first realized Hopfinger would be terminated when Fletcher informed him "he'd written a letter and had it ready for her." (Doc. 131-5 at p. 3). At the meeting, Rolf verbally advised Hopfinger that the decision had been made to terminate her employment. (Doc. 103-2 at p. 5). Furthermore, her position was being eliminated and combined with another position. (*Id.*). At that point, Hopfinger called her attorney. (*Id.*).

Fletcher denies making the decision to fire Hopfinger and asserts he was informed by Rolf on either August 31, 2017, or September 1, 2017, that the City was going to terminate her employment. (Doc. 130-8). According to Fletcher, Rolf directed Fletcher to meet him at the Department to terminate Hopfinger. (Doc. 130-3 at p. 7). Rolf also directed Fletcher to write a termination letter on September 1, 2017, which he did (*Id.*). Fletcher stated that he "did not decide to discharge [Hopfinger]," nor did he recommend that she be fired. (Doc. 131-15).

After Hopfinger's verbal termination and call to her attorney, the City contacted Attorney DeFranco to discuss the matter. (Doc. 130-9 at p. 10). On August 31, 2017, DeFranco met with Fletcher, Rolf, and City Council member Fark to advise them of certain legal criteria they needed to consider in deciding to terminate Hopfinger's employment. (Doc. 153; Doc. 130-9 at p. 5). According to DeFranco, the City's issue with Hopfinger was not her FMLA leave, but "whether there was time being recorded and paid by the city, when services

---

[3] The audio recording of the meeting does not document this conversation, if it occurred.

weren't being performed." (Doc. 148). He further testified: "There was a frustration expressed about her, I don't think there was grounds for discharge, but she kept certain records under lock and key and she would take them home so they couldn't access it, I know that irritated them, I don't know, I think it may have impeded their investigation, but their stated reason was the entry of time and payment by the City of time that was not worked." (*Id.*).

Prior to Hopfinger's termination, City Council members Fark, Finke, Kozuszek, Hargen, Sheridan, and Kellerman had no knowledge of any communications between Hopfinger and Rolf concerning Fletcher's timekeeping issues or firearms qualification, nor were they aware of Hopfinger's discussion with Ryker. (Docs. 103-7, 8, 9, 10, 11, 12).

## LEGAL STANDARD

Summary judgment is only appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (quoting FED. R. CIV. P. 56(a)). Once the moving party sets forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 232-24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[i]nferences that rely upon speculation or conjecture

are insufficient." *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial." *Id.* (citation omitted).

DISCUSSION

## I.    First Amendment Retaliation

Hopfinger argues that her termination was retaliation for her statement in early May 2017 to Mayor Rolf regarding Fletcher's failure to account for his absences from work, as well as her May 30, 2017 statement to Lee Ryker about Fletcher's forged firearms qualification. Defendants have moved for summary judgment on Count V on the grounds that Hopfinger has not made and cannot make a *prima facie* case for First Amendment retaliation.

To succeed on a Section 1983 claim, a plaintiff must show that a government official took "retaliatory actions" against the plaintiff for engaging in protected speech. *Nieves v. Bartlett*, 139 S.Ct. 1715, 1722 (2019). "If an official takes adverse action against someone based on that forbidden motive, and non-retaliatory grounds are in fact insufficient to provoke the adverse consequences, the injured person may generally seek relief by bringing a First Amendment Claim." *Id.*

To make out a *prima facie* claim for a violation of First Amendment rights, a public employee like Hopfinger must "present evidence that (1) [her] speech was constitutionally protected; (2) [s]he suffered a deprivation likely to deter free speech; and (3) [her] speech was at least a motivating factor in the employer's actions. *Consolino v. Towne*, 872 F.3d 825, 829 (7th Cir. 2017) (citations omitted). "The burden then shifts to the defendant to show that it would have taken the same action even in the absence of the protected conduct." *Id.*

The retaliatory conduct must be sufficiently adverse to deter the exercise of an employee's First Amendment rights. *Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000). "Any deprivation under color of law that is likely to deter the exercise of free speech, whether by an employee or anyone else, is actionable, even something as trivial as making fun of an employee for bringing a birthday cake to the office to celebrate another employee's birthday . . . if . . . the circumstances are such as to make such a refusal an effective deterrent to the exercise of a fragile liberty." *Id.* A "campaign of petty harassment" or "false accusations" all may suffice. *DeGuiseppe v. Village of Bellwood*, 68 F.3d 187, 192 (7th Cir. 1995).

Defendants do not deny that Hopfinger suffered a deprivation likely to deter free speech. They do, however, argue that her speech was not constitutionally protected and that Hopfinger presented no evidence her speech was the motivating factor in her termination.

### A.    First Amendment Protected Speech

"For a public employee's speech to be protected under the First Amendment, (1) the employee must speak as a private citizen, (2) the speech must address a matter of public concern, and (3) the employee's interest in expressing the speech cannot be outweighed by the state's interest in promoting effective and efficient public service." *Willoby v. Mason City, Illinois*, 449 F. Supp. 3d 806, 816 (C.D. Ill. 2020) (citing *Davis v. City of Chicago*, 889 F.3d 842, 845 (7th Cir. 2018) (internal quotation marks omitted)). Whether speech is constitutionally protected is a question of law. *Kubiak v. City of Chicago*, 810 F.3d 476, 481 (7th Cir. 2016).

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). "[T]he mere fact that a citizen's speech concerns information acquired by

virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Lane v. Franks*, 573 U.S. 228, 240 (2014). Rather, the inquiry is whether the speech is ordinarily within the scope of the employee's normal duties—"not whether it merely concerns those duties." *Id.* Determining a public employee's official duties requires a practical analysis of both formal job requirements and informal workplace duties and expectations. *Davis*, 889 F.3d at 845.

Defendants argue Hopfinger's speech to both Rolf and Ryker fell practically within her general duties and responsibilities as the administrative assistant for the Department or were at least "intimately connected" with those duties and responsibilities. *See Kubiak*, 810 F.3d at 482. Specifically, Fletcher argues that Hopfinger's speech to Rolf that Fletcher was failing to provide sufficient information to properly account for his absences and was not speaking with her fell within her general responsibility for preparing and submitting Police Department payroll sheets to City Hall. And second, her speech to Ryker fell within her general responsibility for obtaining duty weapons qualifications documents from the Department's officers and recording them for submission to the Illinois Law Enforcement Training and Standards Board.

The Court disagrees. Reporting the Police Chief's misuse of his leave time was not part of Hopfinger's formal or informal job duties, which distinguishes her situation from that of the plaintiff in *Kubiak*. There, the plaintiff police officer claimed she was retaliated against for reporting workplace harassment. *Kubiak*, 810 F.3d at 479-80. The Seventh Circuit held that her speech was made as an employee, not a private citizen, because an employee—especially a police officer—would be expected to report her colleague's inappropriate behavior to a supervisor. *Id.* at 481-82. Furthermore, the speech was "intimately connected" with her

professional duties. *Id.* at 482. The plaintiff had complained that her colleague berated her over a work-related report, her speech was directed to her supervisor, and the speech was made in an effort to improve her work environment so she would not be harassed again. *Id.*

In this case, there was no formal or informal expectation that Hopfinger would report the Police Chief's misuse of time. While Hopfinger was responsible for submitting timesheets to City Hall, she has pointed to evidence that Fletcher, as part of the City's Management Personnel, was required to report his own sick leave, vacation, holiday, and comp time directly to City Hall on a monthly basis. (Doc. 131-14 at p. 11). And while Fletcher occasionally told or texted Hopfinger his leave use, which she would write down and fax to the City Clerk, her role was merely clerical in nature. (Doc. 131-1 at ¶ 2). Furthermore, there is no evidence Hopfinger reported Fletcher's use of time in an effort to make her own work environment better. Rather, Hopfinger attested that she reported Fletcher's misuse of time to Rolf because she believed that he was cheating on the time for which the City of Nashville was paying him and she believed Rolf could do something about this misuse of taxpayer dollars. (*Id.* at ¶ 3). Accordingly, the Court finds her speech was made as a private citizen, not as a public employee.

Likewise, Hopfinger's speech to Ryker was not intimately connected to her professional duties. Hopfinger's job was not to review the firearms' qualifications forms for accuracy or to report any falsification to State officials. Instead, her role was limited to inputting dates from the handwritten forms into the computer on the Illinois Training Standards Board system. (*Id.* at ¶¶ 9, 11). Hopfinger told Ryker about the alterations on the firearms qualifications forms because she thought he could do something about it. (*Id.* at ¶ 11). Although Hopfinger acquired information about the alterations on the forms because

of her job, her speech to Ryker was made as a concerned citizen, not as an employee. Thus, her speech is protected by the First Amendment.

### B.    Motivating Factor

To be successful on her First Amendment retaliation claim, Hopfinger also must demonstrate that her expressions were a motivating factor in the retaliatory action. *Consolino*, 872 F.3d at 829. "In order to demonstrate that a defendant was motivated to retaliate based on protected speech, the plaintiff must first produce evidence that the defendant knew about the protected speech." *Id.* at 830. Speculation that the defendant knew about the speech is not enough to defeat summary judgment. *Id.*; *see also Hunt v. DaVita*, 680 F.3d 775, 779 (7th Cir. 2012) ("logic dictates that an inference of retaliatory intent must be based on the alleged retaliator's knowledge of the action allegedly retaliated for").

Here, it is undisputed that the individual City Council member Defendants had no knowledge of Hopfinger's communications with Rolf or Ryker. (Docs. 103-7 to 103-12). Because Hopfinger has presented no evidence that the individual City Council members knew about her speech to Rolf and Ryker, they are entitled to summary judgment.

Of course, Rolf, individually and on behalf of the City of Nashville, knew about his own conversation with Hopfinger. Even so, Hopfinger still must show that this speech was a motivating factor in her termination in order to survive summary judgment. But she has pointed to no evidence that her speech to Rolf motivated the City to terminate her. Thus, summary judgment shall be granted to Rolf and the City of Nashville on Count V.

Finally, Fletcher argues there is no evidence that he had any knowledge of Hopfinger's speech to Rolf or Ryker. With regard to Rolf, Hopfinger admitted she did not tell Fletcher about her conversation with him, and the evidence in the record is that Rolf took no action as

a result of Hopfinger's comments. In response, Hopfinger argues that a jury could reasonably infer that Rolf would have talked to Fletcher about his abuse of time because he took complaints about time seriously. As evidence that Rolf took complaints about time seriously, Hopfinger points to the minutes from the August 3 City Council meeting where Rolf and Fletcher first raised the issues regarding Hopfinger's July 21, 2017 timesheet. (Doc. 131-13). Hopfinger also claims a jury could infer Fletcher knew about her speech because he raised the issue of her timesheet at that August 3 meeting. Because she complained about his time, he complained about hers.

With regard to Hopfinger's speech to Ryker, neither Hopfinger nor her husband Greg told Fletcher about their discussion with Ryker. Hopfinger, however, makes several arguments that a jury could *infer* Fletcher knew that Hopfinger told Ryker about the firearms qualification backdating. She argues that a jury could find Fletcher knew about the conversation because he read the letter Ryker left for him. But the letter did not mention Hopfinger at all. She also avers that a jury could infer Fletcher said he was eating so that he could avoid the problem and so that he would not be around to hear Hopfinger make "the inevitable complaint." But even if this were true, it has no bearing on whether Fletcher knew she actually spoke to Ryker. Most importantly, Ryker has attested that he never spoke with, corresponded with, or otherwise advised Fletcher of his conversation with Hopfinger. (Doc. 134-1).

Summary judgment is the time to produce evidence in support of one's claims, and Hopfinger has failed to do that here. Instead, she has presented speculation that Fletcher could have known about her speech if a jury were to make a number of inferences—some quite unreasonable. *See Consolino*, 872 F.3d at 829 ("Speculation that the defendant knew

about the speech is not enough to defeat summary judgment."); *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (inferences supported only by speculation or conjecture will not defeat a summary judgment motion). Without evidence that Fletcher knew about her speech to Rolf and Ryker, and that the speech motivated Fletcher to retaliate against her, the claim against Fletcher in Count V fails.

## II.     FMLA Interference

In Count I of her Amended Complaint, Hopfinger sued the City of Nashville for interfering with her FMLA rights by failing to restore her to her job at the end of her leave. (Doc. 17).

"The FMLA entitles an eligible employee to take up to twelve work weeks of leave when the employee has a serious health condition that renders him unable to perform his position." *Lutes v. United Trailers, Inc.*, 950 F.3d 359, 364 (7th Cir. 2020) (citing 29 U.S.C. § 2612(a). The employee then has a right to job restoration at the end of the leave period. 29 U.S.C. § 2612. An employer may not interfere with an employee's attempt to exercise her FMLA rights. 29 U.S.C. § 2615(a).

"To prevail on a claim that an employer interfered with the employee's rights under the FMLA, the employee must demonstrate (1) [s]he was eligible for the FMLA, (2) [her] employer was covered by the FMLA, (3) [s]he was entitled to leave under the FMLA, (4) [s]he provided notice of his intent to take leave, and (5) [her] employer denied [her] FMLA benefits to which [s]he was entitled. *Id.* at 363 (citing 29 U.S.C. § 2615; *Guzman v. Brown Cty.*, 884 F.3d 633, 638 (7th Cir. 2018)). "[A]n employee need only show that his employer deprived him of an FMLA entitlement; no finding of ill intent is required." *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006).

"The employee and the employer have shifting responsibilities under the FMLA."
*Lutes*, 950 F.3d at 364. An employee must notify her employer of her probable need for leave.
*Id.* The employee does not, however, need to be aware of her FMLA rights to invoke them:
"[t]he employee need not expressly assert rights under the FMLA or even mention the FMLA,
but may only state that leave is needed." *Id.* (citing 29 C.F.R. § 825.303(b); § 825.301(b)). The
FMLA shifts the burden to the employer to notify the employee about her rights and
obligations in using that leave. If the employer does not have enough information about the
reason for the requested leave, the employer should inquire further to determine whether the
leave is potentially FMLA-qualifying. *Id.* The employer must then notify the employee
whether the leave qualifies under the FMLA within five business days after the employee
requested leave, absent extenuating circumstances. *Id.*; § 825.300(d). At the same time, the
employee must comply with the employer's usual notice requirements for requesting leave.
*Id.* If the employee fails to do so, FMLA leave may be delayed or denied. *Id.*

Here, it is undisputed that Hopfinger was eligible for FMLA protections, the City of
Nashville was covered by the FMLA, and Hopfinger was entitled to take FMLA leave due to
a serious health condition.

The City of Nashville argues, however, that Hopfinger did not properly provide
notice of her intent to take FMLA leave when she failed to submit the required physician's
certification statement to the City. *See* 29 U.S.C. § 2613. The City contends that Hopfinger had
previously submitted the certification for leave she took in previous years, so she knew of the
requirement. But as noted by Hopfinger, she signed and submitted her physician's
certification for her prior leave *after* she returned to work. (Doc. 130-2 at pp. 16-19). Thus, a
reasonable jury could find that the City's policy required employees to submit certifications

after their leave.

Even if the City required such documentation prior to an employee's leave, it was the City's duty to notify Hopfinger about her rights and obligations. Hopfinger testified she told Fletcher about her need for leave via a submitted written request and she attempted to talk to him about her surgery, though he refused to talk about her personal matters. Certainly her husband, who was the Lieutenant, knew about her surgery and required leave. Hopfinger also provided evidence of a text message exchange between Fletcher and a subordinate, joking about Hopfinger's medical condition. (Doc. 130-3 at p. 41). Fletcher clearly had notice of Hopfinger's need for leave.

The City next argues that, even if Hopfinger was engaged in legitimate FMLA activity—she was—the recommendation for her termination was based solely on her fraudulent timesheets. Under the FMLA, "if the employer claims that the employee would have been discharged or that the employee's position would have been eliminated even if the employee had not taken the leave, the employee, in order to establish the entitlement protected by § 2614(a)(1), must . . . convince the trier of fact that the contrary evidence submitted by the employer is insufficient and that the employee would not have been discharged or his position would not have been eliminated if he had not taken FMLA leave." *Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1018 (7th Cir. 2000).

Here, a reasonable jury could find the City's evidence that it terminated Hopfinger solely because of her fraudulent timesheets to be insufficient. As an initial matter, had the City provided Hopfinger with the required FMLA notice, she may not have submitted what the City considered to be "fraudulent" timesheets. Additionally, under the City of Nashville's Employee Handbook, "[e]mployees who request leave under the Family and Medical Leave

Act (FMLA) will be required to use accrued paid time off before receiving unpaid leave. . . . If the employee has accumulated paid time and is off for a reason covered by the FMLA, the appropriate accumulated paid time will be charged toward the 12 weeks of family and medical leave." (Doc. 131-14). Hopfinger has presented evidence that she was using her accumulated paid time off to account for her absence, and the City has presented no evidence that Hopfinger should have accounted for her leave any differently than she did on her timesheet.

Moreover, the City of Nashville has presented evidence that its attorney, Jim DeFranco, provided it with legal criteria for terminating Hopfinger on August 31, 2017. But the decision to fire Hopfinger was made, at the latest, on August 30, 3017, when she was verbally terminated. (*See, e.g.*, Doc. 105-3). And who made that decision is a question of fact. Rolf and the City claim Fletcher made the decision to terminate Hopfinger; Fletcher denies making the decision and claims the Rolf terminated Hopfinger. Given these inconsistencies, a reasonable jury could find the City's evidence insufficient to show that Hopfinger's position would have been eliminated even if she had not taken FMLA leave. Therefore, summary judgment will be denied to the City of Nashville. At the same time, these questions of fact also preclude the entry of judgment in favor of Hopfinger. Thus, summary judgment is denied to both the City and Hopfinger on Count I.

### III.   FMLA Retaliation

To establish FMLA retaliation, an employee must demonstrate she was engaged in a protected activity, the employer took an adverse employment action against her, and there was a connection between her protected activity and the adverse employment action. *Lutes*, 950 F.3d at 363 (citing *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 220 (7th Cir. 2015)).

Evidence supporting a claim of retaliatory discharge under the FMLA includes suspicious timing, evidence that similarly situated employees were treated differently, and evidence that the employer offered a pretextual reason for the discharge. *Larson v. Motor Werks of Barrington, Inc.*, No. 15 C 5572, 2018 WL 287747, at *8 (N.D. Ill. Jan. 4, 2018). Suspicious timing alone rarely is enough to overcome summary judgment. *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 221 (7th Cir. 2015). Summary judgment for the employer is proper where the employer provides undisputed evidence that the adverse employment action is based upon the employee's misconduct. *Id.*

Here, Hopfinger was engaged in protected FMLA activity, and she was fired from the City. Thus, to defeat summary judgment, she need only show a causal connection between her leave and her discharge.

The timing of Hopfinger's firing is certainly suspicious; she was fired the day she returned to work from her surgery. Hopfinger also presented evidence that other similarly situated employees were treated differently. The City admitted that other employees submitted timesheets that did not reflect the vacation time they took that week. Instead, it was reflected on the following week's timesheet. (Doc. 130-16; Doc. 130-1). Thus, just by looking at a timesheet, the City could not tell when the employee took their leave. (*Id.*). Yet, these employees were not fired or reprimanded. There is also evidence that Greg Hopfinger told the City Council that Fletcher was not accurately reporting his leave time. Yet, he also was not fired or reprimanded.

The circumstances surrounding Hopfinger's termination are also curious. Fletcher and Rolf point fingers at each other, neither one taking responsibility for making the actual decision to terminate Hopfinger. While the City Council may have believed that Hopfinger

should be terminated because of her timesheets, it is unclear who actually fired Hopfinger and whether her misconduct was truly the basis for her termination.

For these reasons, the Court denies summary judgment to the City on Hopfinger's FMLA retaliation claim in Count II. *See Freelain v. Vill. of Oak Park*, 888 F.3d 895, 905 (7th Cir. 2018) ("Few discrimination cases are so straightforward—indeed they are often factually complex and require sifting through ambiguous pieces of evidence. We repeat our caution that courts should not discard circumstantial evidence simply because it does not provide direct proof of unlawful intent.").

## IV.   Illinois Whistleblower Act Claim Against City of Nashville

The Illinois Whistleblower Act (IWA) was created "to protect employees from adverse employment actions in retaliation for reporting or refusing to engage in unlawful conduct by their employers." *Harris v. City of Chicago*, No. 19 CV 5878, 2020 WL 4815907 (N.D. Ill. Aug. 18, 2020). To proceed on a claim under the IWA, a plaintiff must demonstrate (1) an adverse employment action by her employer, (2) taken in retaliation (3) for the employee's disclosure to a government or law enforcement agency (4) of a suspected violation of an Illinois or federal law, rule, or regulation. *Sweeney v. City of Decatur*, 79 N.E.3d 184, (Ill. App. 2017).

As discussed above, there is no evidence to indicate that anyone other than Hopfinger's husband knew about her communication with Ryker, an investigator with the Illinois Training Standards Board, regarding Fletcher's firearms qualification. Thus, Hopfinger cannot show that the City terminated her in retaliation for disclosing the information to Ryker. Likewise, Hopfinger has not demonstrated that her termination was retaliation for her discussion with Rolf regarding Fletcher's absences and use of leave time.[4]

---

[4] It is also unclear whether Fletcher's reported conduct constitutes a violation of an Illinois or federal law, rule,

Accordingly, Hopfinger's IWA claim in Count VI fails.

## V.      Common Law Retaliatory Discharge

Hopfinger next claims that her termination violated the public policy of the State of Illinois as expressed in the Illinois Whistleblower Act, the Local Governmental Employees Political Rights Act, and the Police Training Act.

"The tort of retaliatory discharge is a limited and narrow exception to the general rule that an at-will employee is terminable at any time for any or no cause." *Trochuck v. Patterson Companies, Inc.*, 851 F. Supp. 2d 1147, 1150 (S.D. Ill. 2012) (citing *Geary v. Telular Corp.*, 793 N.E.2d 128, 133 (Ill. App. Ct. 2003)). To establish a claim for retaliatory discharge, a plaintiff must show: (1) she was discharged in retaliation for her activities; and (2) the discharge violated a clearly mandated public policy. *Id.* (citing *Fellhauer v. Geneva*, 568 N.E.2d 870, 875 (Ill. 1991)). "[T]he mere citation of a constitutional or statutory provision in a complaint will not by itself be sufficient to state a cause of action for retaliatory discharge. Rather, a plaintiff must demonstrate that the public policy mandated by the cited provision is violated by his discharge." *Fellhauer*, 568 N.E.2d at 875.

Again, there is no evidence in the record that Hopfinger was discharged in retaliation for her speech regarding Fletcher's use of time or firearms qualification. Thus, there is no evidence that her discharge violated the public policy expressed in any of the above-referenced statutes. The City is entitled to summary judgment on Count VII.

## VI.     Good Faith Affirmative Defense

Hopfinger has moved for summary judgment on the City's affirmative defense that it acted in good faith and had reasonable grounds for believing its actions did not violate the

---

or regulation.

FMLA. (Doc. 104). As noted by Hopfinger, this is the FMLA affirmative defense to liquidated damages under 29 U.S.C. § 2617(a)(1)(A)(iii).

Under 29 U.S.C. § 2617(a)(1)(A)(iii), a plaintiff is entitled to liquidated damages equal to her backpay and interest for a violation of § 2615 unless the employer proves that: (1) the act or omission that violated § 2615 was taken in good faith; and (2) the employer had reasonable grounds for believing that the act or omission did not violate § 2615. "The good faith defense requires proof of the employer's subjective intent to comply with the Act, as well as evidence of objective reasonableness in the employer's application of the Act." *Morgan v. SpeakEasy, LLC*, 625 F. Supp. 2d 632, 658 (N.D. Ill. 2007) (citing *Castro v. Chicago Housing Auth.*, 360 F.3d 721, 730 (7th Cir 2004). Defendants bear a substantial burden of proof as to the mitigation defense. *Id.* (citing *Bankston v. State of Illinois*, 60 F.3d 1249, 1254 (7th Cir. 1995)).

Hopfinger avers that the City cannot produce any evidence of its subjective intent to comply with the FMLA because the City has denied that it decided to fire Hopfinger and instead points to Fletcher. But Fletcher also denies making the decision to fire Hopfinger. So, in essence, there is no evidence of anyone's subjective intent to comply with the FMLA. And without evidence of a subjective belief, the City cannot offer evidence of its objective reasonableness in applying the FMLA. For that reason, Hopfinger asks the Court to grant summary judgment in her favor on Nashville's good faith affirmative defense to liquidated damages.

For the same reason that the Court denied summary judgment on Hopfinger's FMLA claims, it also denies summary judgment on the City's affirmative defense. There are simply too many questions of fact surrounding who made the ultimate decision to terminate Hopfinger and whether that person or persons intended to comply with the FMLA in doing

so. Accordingly, Hopfinger's motion is denied.

## VII.   Adverse Inference

Hopfinger has moved for an adverse inference finding regarding the records of the meeting on August 31, 2017, during which Hopfinger's termination was discussed. (Doc. 106). This was the meeting Jim DeFranco held with Fletcher, Rolf, and Fark. According to Hopfinger, because the City Council had six members, the attendance of three members would constitute a quorum, meaning the meeting was subject to the Open Meetings Act, 5 ILL. COMP. STAT. § 120/1.02. Thus, Hopfinger argues, Nashville was required by law to keep not only minutes of the meeting but a verbatim recording as well, because it was a closed session. *See* 5 ILL. COMP. STAT. § 120/2.06(a). The City has neither identified nor produced documents related to the August 31 meeting, however, despite Hopfinger's discovery requests. Because the City has produced no minutes or recordings that it was required by law to retain, Hopfinger seeks an adverse inference jury instruction.

In response, the City argues that the legal consultation that occurred on August 31 did not constitute a quorum because only one of six City Council members was present at the meeting—Josh Fark. As such, under Illinois law, the "gathering" with DeFranco did not constitute a meeting or a closed session such that there was a legal duty to retain minutes or a recording of the day's events. And even if the "gathering" constituted a meeting of a public body under the Open Meetings Act, the City argues, there is no evidence that the City acted in bad faith. The City also claims Hopfinger had 60 days after learning of the meeting to bring a civil action alleging noncompliance with the Act. Because she failed to do so, she is barred from seeking relief via her motion for adverse inference.

When a party intentionally destroys evidence in bad faith, a court may instruct the

jury to infer the evidence contained incriminatory content. *Bracey v. Grondin*, 712 F.3d 1012, 1018–19 (7th Cir. 2013) (citing *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 644 (7th Cir. 2008)). "A party destroys a document in bad faith when it does so for the purpose of hiding adverse information." *Id.* at 1019 (quotation marks omitted).

As an initial matter, the City's argument that Hopfinger is foreclosed from raising this motion because she filed it too late is unconvincing. The relief available for filing a civil action related to non-compliance with the Open Meetings Act is, among other things, a declaration that the action taken at the closed meeting is null and void. That is not the relief sought here; the 60-day requirement stated in 5 ILL. COMP. STAT. § 120/2.06 is inapplicable to Hopfinger's motion for an adverse inference jury instruction.

Under Section 2.06(a) of the Illinois Open Meetings Act, "[a]ll public bodies shall keep written minutes of all their meetings, whether open or closed, and a verbatim record of all their closed meetings in the form of an audio or video recording." § 120/2.06(a). A "meeting" is defined as "any gathering, whether in person or by video or audio conference, telephone call, electronic means . . . or other means of contemporaneous interactive communication, **of a majority of a quorum of the members of a public body** held for the purpose of discussing public business . . . ." § 120/1.02 (emphasis added). As relevant here, a "public body" includes all legislative, executive, administrative or advisory bodies of a city. *Id.*

The Nashville City Council had six members, five of which have attested that they were not present at the meeting on August 31, 2017. (Doc. 119-1). Chief Fletcher and Mayor Rolf, while present at the meeting, were not members of the public body. Accordingly, the meeting was not required to be recorded under Illinois law. For that reason, the Court will not instruct the jury to infer that such records would have contained incriminatory content

or adverse information.

## CONCLUSION

For the reasons set forth above, the Motion for Summary Judgment filed by Defendant Brian Fletcher (Doc. 100) is **GRANTED**.

The Motion for Summary Judgment filed by Defendants City of Nashville, Illinois, Erik Rolf, Josh Fark, Sue Finke, Terry Kozuszek, Doug Hargen, Kelly Sheridan, and Dennis Kellerman (Doc. 102) is **GRANTED in part and DENIED in part**.

The Motion for Partial Summary Judgment filed by Plaintiff Melissa Hopfinger (Doc. 104) is **DENIED**. Hopfinger's Motion for Adverse Inference Finding and Charge Against Defendant City of Nashville (Doc. 106) also is **DENIED**.

The individual Defendants are **TERMINATED** as parties to this action. The Clerk of Court is **DIRECTED** to enter judgment accordingly at the close of the case.

This case shall proceed to trial on Hopfinger's claim of FMLA Interference in Count I and FMLA retaliation in Count II against the City of Nashville. A status conference will be set by separate order to discuss the current trial date.

**IT IS SO ORDERED.**

**DATED:  March 31, 2021**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**